**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT ASHLAND**

**CIVIL ACTION NO. 18-1-DLB-EBA**

**LEWIS BUSTETTER**                                                                           **PLAINTIFF**


**v.**                              **MEMORANDUM OPINION AND ORDER**


**STANDARD INSURANCE CO.**                                                       **DEFENDANT**

*** *** *** ***

Plaintiff Lewis Bustetter brings this action under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"), claiming that Defendant Standard Insurance Company, as administrator of his employee benefit plan, wrongfully denied him long-term disability and life insurance benefits.   In a September 2019 Memorandum Opinion and Order, the Court remanded the case to Standard for a "full and fair review" of Bustetter's claim.  (Doc. # 52).  Standard once again denied Bustetter's claim for benefits in December 2019, and the case has since been reopened.  (Doc. # 60).   The parties have each filed renewed cross-motions for judgment on the administrative record.  (Docs. # 70 and 71).  These motions have now been fully briefed, (Docs. # 72, 73, 74, and 75), and are ripe for the Court's review.  Because Bustetter has not met his burden of showing that he is disabled under the governing plan, Standard's Motion is **granted** and Bustetter's Motion is **denied**.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

The facts of this case have been recited in several earlier Orders of the Court, (*see* Docs. # 34, 52, and 60), and will be summarized here as necessary.  Plaintiff Bustetter worked as a tank truck driver for CEVA Logistics.  As a benefit of his employment with CEVA, he obtained disability coverage under a Group Long-term Disability ("LTD") Policy (#647503-D) and a Group Life Policy (#647503-A).  (AR 611, 730).  When Bustetter became injured in 2015, Standard approved Bustetter's claim for LTD benefits, finding that his neck sprain, shoulder pain, cervicalgia spinal stenosis, SLAP lesion, shoulder tendinosis, and impending back surgery rendered him unable to work in his current occupation as a tank truck driver.  (AR 375, 455).  Bustetter also received life insurance without payment of premium ("LWOP") benefits under the Group Life Policy.  (AR 1409).

To continue receiving LTD benefits past 24 months, Bustetter had to clear two hurdles.  First, he had to show disability stemming from a condition that was not excluded under the Plan.  The LTD Policy caps payments at 24 months for disability caused by "Other Limited Conditions," notably chronic pain conditions, carpal tunnel, arthritis, and "diseases or disorders of the cervical, thoracic, or lumbosacral back and its surrounding soft tissue."  (AR 9).  In July 2016, Bustetter was diagnosed with myelitis of the cervical spine, a condition expressly excepted from the list of "Other Limited Conditions" in the Group LTD Policy.  (AR 9, 138, 152).  Standard confirmed with Bustetter on November 14, 2016 that his diagnosis of myelitis meant that his LTD coverage would not be limited by the two-year cap for "Other Limited Conditions."  (AR 472).  Second, Bustetter had to show that his medical condition made him unable to work in "Any Occupation," defined as an occupation "available at one or more locations in the national economy" and in

which the participant would "be expected to earn at least 60% of [his] Indexed Predisability Earnings within twelve months following [his] return to work."  (AR 31).

In support of his claim that he is unable to perform "Any Occupation," Bustetter submitted records and information from his treating physicians.  Dr. Douglas Deitch reported on March 27, 2015 that Bustetter should "avoid repetitive bending [of the] neck and lumbar" due to his "lumbar radiculopathies, lumbar herniated disc, neck pain, and cervical stenosis."   (AR 1060).   An MRI from March 31, 2016 revealed a "slight enlargement of the cord lesion," which "suggest[ed] an inflammatory etiology such as viral myelitis or systemic autoimmune disease."  (AR 151).   Another of Bustetter's treating physicians, Dr. Paul Moots, noted on April 1, 2016 that Bustetter's gait was "stiff and was slightly wide base."  (AR 150).   In reviewing the MRI of Bustetter's spine, Dr. Moots diagnosed Bustetter with "[c]ervical myelopathy related to intrinsic spinal cord lesion at C7" and noted that "[m]yelitis is favored given the partial resolution of the MRI findings." (AR 138).

In December 2016, Standard notified Bustetter that he did not satisfy the Group LTD Policy's "Any Occupation" definition of disability and therefore did not qualify for continued LTD benefits past January 7, 2017.  (AR 332-335).  Standard also discontinued Bustetter's LWOP benefits because he did not satisfy the Group Life Policy's similar requirement that he be "Totally Disabled," defined as someone who "as a result of Sickness, accidental Injury, or Pregnancy," is "unable to perform with reasonable continuity the material duties of any gainful occupation for which [he is] reasonably fitted by education, training and experience."  (AR 783).

In denying Bustetter's claim, Standard conceded that Bustetter was limited by cervical myelitis but nonetheless concluded that he was able to perform sedentary work with certain restrictions.  (AR 396-401).  Standard relied upon the opinions of three consulting physicians who had conducted a review of Bustetter's medical file.  Dr. John Hart, for example, opined that Bustetter's myelitis "is documented to be improving" and "strength and sensation on neurological examination regarding the upper extremities and the cervical spine were essentially normal on multiple examinations at Vanderbilt [University Hospital]."  (AR 119).  Based on this medical evidence, Dr. Hart determined that Bustetter had the functional capacity for light-level work.  (AR 118).

In addition, Standard hired a vocational expert, Brian Petersen, to conduct a Transferable Skills Assessment ("TSA").  (AR 619-638).  In his report, Petersen observed that Bustetter has an Associate in Arts degree from Ashland Community College and an employment history as a truck driver.  (AR 642).  He also noted that Bustetter has fifteen years of customer service experience, including brief experience in telephone account collections.  (AR 642-643).  From this work history, Petersen determined that Bustetter could engage in sedentary occupations within his skillset, including motor vehicle dispatcher, collection clerk, and order clerk.  (AR 625).  Petersen further concluded that these occupations would meet the wage requirements under the Group LTD Policy.  (*Id.*).

After Standard denied Bustetter's request for continued LTD and LWOP benefits, Bustetter filed an administrative appeal and submitted additional evidence.  (AR 85).  First, Bustetter provided Standard with a Functional Capacity Evaluation ("FCE") conducted by physical therapist Karen Scholl on January 16, 2017, two months after Standard's initial decision to deny Plaintiff's claims.  (AR 110-112).  The FCE stated that

Plaintiff was suffering from hypertension, osteoarthritis, ulcers, asthma, and transverse myelitis, and that he was "unable to work at this time due to multiple areas of significant pain." (AR 110). Scholl also found Bustetter to be limited to forty-five to sixty minutes of sitting, five minutes of standing, and one minute of walking. (AR 112). Furthermore, Bustetter's fine motor skills on his right side were "impaired bilaterally due to pain and task performance" and "impaired by 50%." (*Id.*). Finally, the FCE stated that Bustetter should avoid bending, squatting, kneeling, and climbing, and should lift up to three pounds "rarely." (*Id.*).

In addition to the FCE, Bustetter submitted records from visits with his neurologist Dr. Stephanie Lynn Dalton. (AR 89-107). Dr. Dalton noted Plaintiff's FCE from January and stated that his spinal cord lesion had left permanent damage and "therefore his noted functional capacity will likely be impaired long term." (AR 89). Dr. Dalton also reported that since his myelitis diagnosis, Bustetter "has continued to have weakness/sensory loss, painful muscle spasms, bladder and sexual dysfunction." (*Id.*). During a visit to Dr. Dalton on March 23, 2017, Bustetter exhibited "mild weakness as well as a noted spinal sensory level and gait dysfunction." (*Id.*). In a subsequent visit, Dr. Dalton reported that Bustetter "[c]ontinues to ambulate with a cane," but that "Robaxin seems to be helping quite a bit without any significant side effects. If muscle spasm pain was a 10 before, now a 7/10 sometimes down to 5/10." (AR 90).

As part of Bustetter's administrative appeal, Standard hired Dr. Deborah Syna to review Bustetter's additional medical records. (AR 71-81). In her report dated June 7, 2017, Dr. Syna concluded that Bustetter was "restricted to sedentary-level activity" due to his cervical myelitis and gait disturbance. (AR 75). Dr. Syna also found that Bustetter

had the capacity for occasional standing and walking with the assistance of a cane and could lift or carry five to ten pounds using one arm.  (*Id.*).  Furthermore, Dr. Syna concluded that Bustetter was able to reach and finger "continuously" on the right, but only "frequently" on the left due to carpal tunnel syndrome.  (*Id.*).

Standard consulted again with its vocational expert, Mr. Petersen, who opined that, when considering Dr. Syna's findings, Bustetter was capable of performing the sedentary occupations of motor vehicle dispatcher, collection clerk, and order clerk.  (AR 615).  Petersen further concluded that Bustetter's physical limitations either posed no impediment to his completion of the job requirements or could be accommodated at the workplace.  (*Id.*).  For example, he stated that "[a]ny lifting required could either be performed with one arm or be accommodated" and "[p]ostural change could be accommodated . . . with the provision of a sit/stand workstation."  (*Id.*).  Petersen also determined that Bustetter could perform in any of the identified occupations without having to lift more than three pounds, the weight limit identified in Bustetter's January 2017 FCE.  (AR 614).  Therefore, on August 4, 2017, Standard informed Bustetter that the initial decision on his claim was upheld and that his request for continued LTD and LWOP benefits would be denied.  (AR 396-401).

Having exhausted his administrative remedies, Bustetter initiated this lawsuit under ERISA, seeking review of Standard's decision denying his request for LTD and LWOP benefits.  (Doc. # 1).  Pursuant to the Court's Scheduling Order, the parties cross-moved for judgment on the administrative record.  (Docs. # 46 and 47).  On September 24, 2019, the Court granted in part Bustetter's Motion, holding that Standard had acted

arbitrarily and capriciously in denying Bustetter LTD and LWOP benefits.[1]  (Doc. # 52).

In its decision, the Court reasoned that Standard's consulting physician, Dr. Syna, had

inadequately explained her disagreement with the findings in Bustetter's January 2017

FCE.  (*Id.* at 12).  Standard's reliance on consulting physicians alone was also insufficient

to rebut Bustetter's subjective complaints of pain.  (*Id.* at 13).  Consequently, Standard

improperly "made an implicit credibility determination without physically examining

Bustetter."  (*Id.* at 14).  In light of these flaws in Standard's decision-making process, the

Court ruled that Standard had arbitrarily denied Bustetter's claims.  (*Id.*).

The Court also found Standard's decision-making process flawed because it used

the same rationale to justify denying Bustetter's LTD and LWOP claims, even though only

the LTD Policy contains the exclusion for "Other Limited Conditions."  (*Id.* at 15-16).

Standard had therefore erroneously failed to consider Bustetter's "Other Limited

Conditions," including carpal tunnel syndrome, severe subscapular tendinosis, and

osteoarthritis, in its determination that Bustetter was not entitled to continued LWOP

benefits.  (*Id.* at 15).

Despite its determination that Standard had acted arbitrarily, the Court held that

the appropriate remedy was remand rather than reinstatement of benefits because

Bustetter had not shown that he was "clearly entitled" to benefits, as required by *Elliott v.

Metropolitan Life Insurance Co.*, 473 F.3d 613, 621 (6th Cir. 2006).  The Court stated that

remand "will allow for a proper determination of whether, in the first instance, Bustetter is

entitled to continued long-term disability and LWOP benefits."  (Doc. # 52 at 17) (alteration

omitted).

---

[1]     Although the parties in their Motions disputed the applicable standard of review, the Court
assumed without deciding that the arbitrary and capricious standard applied.  (Doc. # 52 at 9).

After the remand, Standard informed Bustetter in a letter dated October 11, 2019 that he had the opportunity to submit additional evidence in support of his claim and that Standard would "defer the review until you have submitted all of the information you would like considered." (AR 1531). Bustetter refused Standard's invitation, however, demanding in response that "Standard identify in writing the additional and specific information (e.g. documents, questions, etc.) it needs to approve Mr. Bustetter's claims" and that "[a]bsent any such notice, Mr. Bustetter shall understand that Standard has all of the information necessary to approve his claims." (AR 1529). In its reply letter dated November 4, 2019, Standard gave Bustetter twenty days to submit additional evidence into the record and also unilaterally extended its November 8, 2019 regulatory deadline to issue a decision, citing "the time required to complete the medical review." (AR 1482). The letter, although dated November 4th, was postmarked November 7th and received by Bustetter's counsel on November 12th. (Doc. # 70-2 at 1, 3). Standard eventually issued its decision denying Bustetter's benefits on December 17, 2019. (AR 1453).

As part of its inquiry on remand, Standard did not conduct its own evaluation of Bustetter and instead commissioned yet another file review of Bustetter's medical history, this time by physician Michelle Alpert. After speaking with Bustetter's treating physician, Dr. Dalton, and reviewing Bustetter's treatment and imaging history, Dr. Alpert concluded that Bustetter had cervical myelitis with the following limitations:

> the claimant can do no lifting/carrying/pushing/pulling greater than 20 pounds occasionally, and 10 pounds frequently. Bending and twisting with his neck can only be occasional. He can reach at waist level and below the waist level frequently, but only occasionally above the shoulder level. He has no restrictions of fingering, grasping, gripping, handling, or fine motor activity with his hands.

(AR 1513-1514). Dr. Alpert questioned Bustetter's need for a cane given his normal strength, tone, muscle bulk, and coordination, as well his lack of documented neurological deficits. (AR 1515). In addition, Dr. Alpert sought to discredit the 2017 FCE conducted by Bustetter's physical therapist, Karen Scholl. In Dr. Alpert's view, the FCE's conclusion that Bustetter was "unable to work at this time due to multiple areas of significant pain" failed to take into account any possible accommodations Bustetter might receive in the workplace. (*Id.*). Dr. Alpert also disputed Scholl's conclusion that Bustetter could lift only up to three pounds in light of Bustetter's full strength in his upper and lower extremities and lack of nerve impingement, herniated disc, or other abnormality. (*Id.*). Finally, Dr. Alpert wrote that Scholl's opinion that Bustetter had "impaired fine motor skill" was contradicted by the assessments of Bustetter's treating neurologist and neurosurgeon, neither of whom documented any problem with his fine motor skills. (*Id.*).

Based on Dr. Alpert's opinion and the analysis of its vocational expert, Standard once again denied Bustetter's claims for LTD benefits. (AR 1458). According to Standard, Bustetter had the capacity to perform full-time sedentary positions of motor vehicle dispatcher, collection clerk, and order clerk, and that Bustetter would be able to earn a wage that exceeded the minimum required by the plan. (AR 1457). Standard also determined that Bustetter was ineligible for continued LWOP benefits. Unlike in its previous review, Standard expressly considered Bustetter's "Other Limited Conditions" in deciding that Bustetter was not "Totally Disabled" under the Group Life Policy. (AR 1458).

In its denial letter, Standard wrote that it had become aware that Bustetter had been awarded Social Security Disability Insurance in the amount of $1,323 per month, which was retroactive to April 1, 2015. (AR 1459). Accordingly, Standard notified

Bustetter that he owed $21,933 pursuant to the terms of the Plan, which provide that Standard may reduce LTD benefits by the amount a claimant has received in other "Deductible Income."  (AR 1458-1459).  In a subsequent correspondence, Bustetter's counsel challenged Standard's right to reimbursement.  (AR 1447-1448).  Standard, in response, maintained its right to reimbursement but stated that it was "declining to pursue the overpaid LTD Benefits at this time."  (AR 1440).

Following Standard's decision to deny benefits on remand, Bustetter filed an unopposed motion to reopen the case, (Doc. # 57), which the Court granted, (Doc. # 60). The parties have now cross-moved for judgment on the administrative record with respect to Standard's decision to deny benefits on remand.  (Docs. # 70 and 71).  Those Motions have been fully briefed (Docs. # 72, 73, 74, and 75) and are now ripe for the Court's review.

## II.    ANALYSIS

### A.    Standard of Review

As they did in their first set of cross-motions for summary judgment, the parties disagree on the governing standard of review.  It is undisputed that the Group LTD and Life Insurance Policies vest Standard with discretionary authority to determine eligibility for benefits.   The Policies' "Allocation of Authority" provision provides that the administrator has "full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy."  (AR 43-44). Indeed, such language has been held sufficient to confer discretion to the plan administrator.  *See White v. Std. Ins. Co.*, 895 F. Supp.2d 817, 840-41 (E.D. Mich. 2012).

When, as here, the plan grants the administrator discretionary authority, challenges to a plan administrator's claims decisions are typically reviewed under the highly deferential arbitrary and capricious standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

However, Bustetter makes a compelling argument that Standard forfeited its right to deferential review by taking too long to decide his claim on remand. Under ERISA regulations, a plan administrator has 45 days to process a disability claimant's administrative appeal. *See* 29 CFR §§ 2560.503-1(i)(1)(i), (i)(3)(i). Most courts to have considered the issue have held that this timing rule applies to claim determinations made after a court-ordered remand.[2] *See Spears v. Liberty Life Assur. Co. of Boston*, No. 3:11-cv-1807 (VLB), 2019 WL 4766253, at *29, *32 (D. Conn. Sept. 30, 2019) (collecting cases); *Robertson v. Std. Ins. Co.*, 218 F. Supp.3d 1165, 1169 (D. Or. 2016). Accordingly, Standard had 45 days to come to a decision, a deadline that it could extend on its own provided that it notified Bustetter in advance and identified "special circumstances" justifying the delay. *See* 29 CFR §§ 2560.503-1(i)(1)(i), (i)(3)(i). The remand decision came down on September 24, 2019, so Standard's deadline to decide Bustetter's claim was November 8, 2019. *See Robertson*, 218 F. Supp.3d at 1171 ("The deadlines in the claim regulations begin to run from the date of this Court's order remanding the claim."). On November 7, 2019, Standard mailed Bustetter a letter stating that it was extending the deadline to decide his claim by 45 days, but the letter did not arrive until November 12, 2019 four days after the deadline. (Doc. # 70-2 at 1-3). Standard wrote that the extension

---

[2]     Although Standard contends that it was not bound by any timeliness rules on remand, it wrote to Bustetter in its extension letter that "[i]t is The Standard's goal to complete all requests for reviews within 45 days" and that "[t]hese review timeframes are pursuant to regulations issued by the U.S. Department of Labor." (AR 1482).

was needed "[d]ue to the time required to complete the medical review."  (*Id.* at 1).
Standard eventually rendered a decision denying Bustetter's benefits on December 17,
2019.  (AR 1453).

Bustetter contends that, to be timely, the letter extending the time for review had
to reach its destination before the initial deadline.  (Doc. # 70 at 21).  Standard contends
otherwise, insisting that the letter was timely because it was mailed before the deadline.
(Doc. # 73 at 20).   Regardless, Standard's reason for extending the deadline—that it
needed more time to conduct a medical review—is not satisfactory under the regulations,
and without a valid basis for extending the deadline, Standard's decision was late.  Under
§ 2560.503-1(i)(1)(i), the extension notice must indicate "special circumstances"
necessitating an extension of time.  Needing additional time for physician review is not a
"special circumstance."  *Salisbury v. Prudential Ins. Co. of Am.*, 238 F. Supp.3d 444, 449-
50 (S.D.N.Y. 2017); *see also Aitken v. Aetna Life Ins. Co.*, No. 16 Civ. 4606 (PGG), 2018
WL 4608217, at *13 (S.D.N.Y. Sept. 25, 2018); *Hancock v. Aetna Life Ins. Co.*, 251 F.
Supp.3d 1363, 1374 (W.D. Wash. 2017).   Accordingly, Standard did not comply with
ERISA's claim processing requirements when it delayed its decision on Bustetter's claim.

There is considerable support for Bustetter's assertion that a violation of the timing
rules in § 2560.503-1 warrants de novo review.   First, 29 C.F.R. § 2560.503-1(l),
applicable to claims filed after January 1, 2002, provides that a violation of the claims
processing rules in § 2560.503-1 permits an ERISA claimant to go straight to federal
court:

> in the case of the failure of a plan to establish or follow claims procedures
> consistent with the requirements of this section, a claimant shall be deemed
> to have exhausted the administrative remedies available under the plan and
> shall be entitled to pursue any available remedies under section 502(a) of

the Act [29 U.S.C. § 1132(a)] on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.

Three circuits have held that this provision, when triggered, requires de novo review of challenges to a plan administrator's denial of benefits.[3] *See Fessenden v. Reliance Std. Life Ins. Co.*, 927 F.3d 998, 1001-03 (7th Cir. 2019) (Barrett, J.); *Halo v. Yale Health Plan*, 819 F.3d 42, 53 (2d Cir. 2016); *LaAsmar v. Phelps Dodge Corp. Life*, 605 F.3d 789, 798-99 (10th Cir. 2010); *but see McIntyre v. Reliance Std. Life Ins. Co.*, 972 F.3d 955, 964-65 (8th Cir. 2020).[4] In *Fessenden*, for example, the plan administrator issued its decision denying the claimant's administrative appeal eight days after the

---

[3]     A more recent version of the regulations that came into effect on April 1, 2018 expressly provides for de novo review in cases where a plan administrator failed to adhere to the claims processing requirements. *See* 29 C.F.R. § 2560.503-1(l)(2)(i) (2018) ("In the case of a claim for disability benefits, if the plan fails to strictly adhere to all the requirements of this section with respect to a claim, the claimant is deemed to have exhausted the administrative remedies available under the plan . . . . Accordingly, the claimant is entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim. If a claimant chooses to pursue remedies under section 502(a) of the Act under such circumstances, the claim or appeal is deemed denied on review *without the exercise of discretion by an appropriate fiduciary*.") (emphasis added). However, because Bustetter filed his original claim for benefits before the 2018 regulations went into effect, the 2002 version of the regulations govern this case. *See* 29 C.F.R. § 2560.503-1(p)(3); *Smith v. Hartford Life & Accident Ins. Co.*, 421 F. Supp.3d 416, 420 (E.D. Ky. 2019); *Solnin v. Sun Life & Health Ins. Co.*, 766 F. Supp.2d 380, 394 (E.D.N.Y. 2011).

[4]     In a recent decision, the Sixth Circuit expressly reserved the question presented in this case: whether § 2560.503-1(l)(1) requires de novo review in cases where the administrator issues an untimely decision before the claimant files suit. *Duncan v. Minnesota Life Ins. Co.*, --- F. App'x ----, 2021 WL 494709, at *6 n.3 (6th Cir. Feb. 10, 2021). While the Sixth Circuit noted that some district courts have declined to apply de novo review where, as here, "the plan administrator issues an untimely decision but does so before the claimant files suit," *id.*, Standard does not argue that Bustetter's decision to wait until Standard issued its late decision precludes the application of de novo review. In any case, the argument is unpersuasive because an employee is disadvantaged by an administrator's late decision regardless of whether he goes to court right away. As the Seventh Circuit put it, "giving administrators a post-exhaustion grace period creates problems" in part because "delaying payment of a claim imposes financial pressure on the claimant" and puts the employee in a predicament: "Should she wait a little bit longer just in case the administrator makes a decision? Or should she go ahead, attempting to frame her case in a way that is responsive to a decision that hasn't yet—but may still—come?" *Fessenden*, 927 F.3d at 1003-05.

deadline in §§ 2560.503-1(i)(1)(i) and (i)(3)(i).  927 F.3d at 999.  The plaintiff argued that, as a result, the administrator had "forfeited the benefit of deference when it blew the deadline."  *Id.* at 1001.  The Seventh Circuit agreed, holding that "[w]hen a plan administrator commits a procedural violation, . . . it loses the benefit of deference and a de novo standard applies."  *Id.* at 999-1000.

Contrary to Standard's contention, the Sixth Circuit's decision in *Daniel v. Eaton Corp.*, 839 F.2d 263 (6th Cir. 1988), does not compel a different approach.  Applying the analogous ERISA regulations in place at the time, *Daniel* held that a failure of the administrator "to act on [a claimant's administrative] appeal did not give rise to a de novo action."  *Id.* at 267.  As the court explained in that case, a claimant's remedy for a plan administrator's inaction is immediate judicial review; "the standard of review is no different whether the appeal is actually denied or is deemed denied."  *Id.*

However, the regulations in place at the time *Daniel* was decided were "completely overhauled" in 2002, *Halo*, 819 F.3d at 55, and therefore *Daniel*'s applicability to the newer version of the regulations is questionable.  Section 2560.503-1(l), quoted above, replaced the regulation at issue in *Daniel*, which stated that "[t]he decision on [administrative] review shall be furnished to the claimant within the appropriate time described in paragraph (h)(1) of this section.  If the decision on review is not furnished within such time, the claim shall be deemed denied on review."  29 C.F.R. § 2560.503-1(h)(4) (1988).  While subsection (l) does not mention the standard of review, the preamble to the 2002 regulations explains that the "Department [of Labor's] intentions in including this provision in the proposal were to clarify that the procedural minimums of the regulation are essential to procedural fairness and that a decision made in the absence

of the mandated procedural protections *should not be entitled to any judicial deference*."
ERISA Rules and Regulations for Administration and Enforcement; Claims Procedures,
65 Fed. Reg. 70246, 70255 (Nov. 21, 2000) (emphasis added).  All three circuits to have
applied de novo review cite the preamble to the 2002 regulations as informing the
meaning of subsection (l).  *See Fessenden*, 927 F.3d at 1002-03; *Halo*, 819 F.3d at 52-
54; *LaAsmar*, 605 F.3d at 799.

       In light of the substantial changes to the regulations, cases such as *Daniel*
interpreting the pre-2002 version of the regulations are outdated.  *See Bennett v. MIS
Corp.*, 607 F.3d 1076, 1095 (6th Cir. 2010) (noting that a change in the state of the law
can abrogate a prior published opinion).   In fact, the Seventh Circuit in *Fessenden*
declined to rely on precedent interpreting the pre-2002 version of the regulations, noting
that "[t]he earlier version offered a much less nuanced approach to balancing the
competing interests at stake."  927 F.3d at 1006.  The Second Circuit further explained
the effect of the 2002 regulations on these competing interests:

> "if plans comply with the regulation, which is designed to protect employees,
> the plans get the benefit of both an exhaustion requirement and a
> deferential standard of review when a claimant files suit in federal court—
> protections that will likely encourage employers to continue to voluntarily
> provide employee benefits.  But if plans do not comply with the regulation,
> they are not entitled to these protections."

*Halo*, 819 F.3d at 56.

       Moreover, at least one district court in the Sixth Circuit has under similar
circumstances applied de novo review in spite of *Daniel*, noting the "potentially changing
law on the subject of what standard of review applies in a case involving [ ] procedural
deficiencies" under the 2002 version of the regulations.  *Myers v. Iron Workers Dist.
Council of S. Ohio & Vicinity Pension Tr.*, No. 2:04-cv-966, 2005 WL 2979472, at *5-6

(S.D. Ohio Nov. 7, 2005).  Accordingly, until the Sixth Circuit provides additional guidance on *Daniel*'s continued validity, the Court will follow the prevailing view in the circuits and apply de novo review for violations of the 2002 version of the regulations.[5] [6]  Under de novo review, the question is whether the plan administrator correctly denied benefits under the plan; "the [plan] administrator's decision is accorded no deference or presumption of correctness."  *Hoover v. Provident Life & Acc. Ins. Co.*, 290 F.3d 801, 808-09 (6th Cir. 2002).

### B.    Merits

Even under de novo review, however, Bustetter has not demonstrated that he is entitled to LTD or LWOP benefits.  There is substantial evidence that Bustetter's conditions, including myelitis, carpal tunnel, and arthritis, are serious and contribute to significant decreases in his functional capacity.  There is considerably less evidence, though, with respect to the question of how these conditions make Bustetter unable to work.  And the main evidence relevant to that question—the 2017 FCE conducted by Bustetter's physical therapist—is not sufficiently conclusive or reliable to carry Bustetter's burden of proving disability.

---

[5]    It should be noted that the Sixth Circuit has applied the doctrine of substantial compliance to violations of the notice requirements in 29 C.F.R. § 2560.503-1(g).  *See Moyer v. Metro. Life Ins. Co.*, 762 F.3d 503, 506 (6th Cir. 2014).  But Standard makes no argument that the substantial compliance doctrine applies to violations of § 2560.503-1(i)'s timing requirement or that it in fact substantially complied in this case.  In any event, the Seventh Circuit in *Fessenden* reasoned persuasively that violations of the timing rules in.§ 2560.503-1(i) fall outside the scope of the substantial compliance doctrine, even in cases where the fiduciary issued its decision only a few days late.  927 F.3d at 1005-06.

[6]    Because Standard's violation of the regulations requires de novo review, the Court need not reach Bustetter's argument that Texas law invalidates the discretionary clause in his insurance policy.  (Doc. # 70 at 20).

To be eligible for LTD benefits under the Group Policy past 24 months, a participant must be "Disabled from *all occupations*," meaning that he is "unable to perform with reasonable continuity the Material Duties of *Any Occupation*." (emphasis added) (AR 31). In turn, "Any Occupation" is defined as "any occupation or employment which [the participant is] able to perform, whether due to education, training, or experience, which is available at one or more locations in the national economy and in which [the participant] can be expected to earn at least 60% of [his] Indexed Predisability Earnings within twelve months following [his] return to work." (*Id.*).  An amendment to the LTD policy in effect here provides that certain health conditions may not be considered when determining a participant's disability status.  As relevant to this case, those "Other Limited Conditions" include carpal tunnel and arthritis but expressly do not include myelitis.[7]  (AR 9).

Eligibility for LWOP benefits is governed by the substantially similar "Totally Disabled" standard, which states that "as a result of Sickness, accidental Injury, or Pregnancy, [the participant is] unable to perform with reasonable continuity the material duties of any gainful occupation."  (AR 783).  Notably, however, the Other Limited Conditions exclusion in the LTD Policy does not apply to claims for LWOP benefits.  (*See generally* AR 755-786).

In support of his claims, Bustetter relies principally on the January 2017 FCE conducted by his physical therapist, Karen Scholl.  In that FCE, Ms. Scholl noted that Bustetter suffers from hypertension, osteoarthritis, ulcers, asthma, and transverse myelitis, and was "unable to work at this time due to multiple areas of significant pain."

---

[7]     Bustetter notes that Standard has the burden to show that an exclusion applies.  (Doc. # 72 at 4).  Standard has met that burden with respect to the "Other Limited Conditions" exclusion. (*See* Doc. # 75 at 8).

(AR 110-111).  Scholl also found Bustetter to be limited to forty-five to sixty minutes of sitting, five minutes of standing, and one minute of walking.  (AR 112).  Furthermore, according to Scholl, Bustetter's fine-motor skills on his right side are "impaired bilaterally due to pain and task performance" and "impaired by 50%."  (AR 112).  Finally, the FCE states that Bustetter should avoid bending, squatting, kneeling, and climbing, and that he should lift up to three pounds "rarely."  (AR 112).

However, while Scholl opined that Bustetter is unable to work due to pain, her conclusion does not appear to take into consideration accommodations that Standard's experts say would allow Bustetter to work in a sedentary occupation.  For example, Standard's vocational expert asserted that Bustetter's difficulty sitting for more than 45 minutes at a time could be addressed with the provision of a sit/stand workstation.  (AR 1506).  An employee's documented inability to sit for prolonged periods does not necessarily preclude him from performing full-time sedentary work.  *See Evans v. Metro. Life Ins. Co.*, 190 F. App'x 429, 436 (6th Cir. 2006).  In fact, as one court has noted, a physical therapist's opinion that the employee "does not tolerate prolonged static position of sitting" "supports the conclusion that [the] plaintiff can perform sedentary work with a sit/stand option."  *Lawhorn v. Nortel Networks, Inc.*, No. 3:04-cv-481, 2006 WL 270285, at *7 (E.D. Tenn. Feb. 2, 2006), *aff'd*, 215 F. App'x 446 (6th Cir. 2007).  Bustetter does not quibble with Petersen's opinion that a sit/stand workstation would be available, and he otherwise offers no basis for concluding that his limitation on prolonged sitting prevents him from engaging in sedentary work with accommodations.

The failure to consider accommodations is not the only deficiency in the FCE.  As the Court observed in its earlier opinion, Ms. Scholl listed Bustetter's job duties as "truck

driver/farming," implying that Ms. Scholl considered Bustetter incapable of performing medium-level work rather than sedentary work.  (Doc. # 52 at 12-13).  A statement from a medical provider that a claimant is unable to work is of little value when the type of work referred to is more rigorous than that contemplated by the plan.  *See O'Neill v. Unum Life Ins. Co. of Am.*, No. 18-1382, 2018 WL 7959523, at *4 (6th Cir. Nov. 19, 2018).  The physician's report in *O'Neill*, which concluded that the plaintiff could not perform the material duties of his occupation as an anesthesiologist, "[did] not allow O'Neill to meet his burden of proof" in part because the "report suggest[ed] that [the physician] made his conclusion within the specific parameters of working in a Level II trauma center—'the real world of anesthesiology that [O'Neill] practiced in'—and not within the national economy." *Id.*

In addition, Bustetter fails to address other flaws in the FCE previously identified by the Court:

> Standard asserts that "Ms. Scholl did not distinguish limitations that may result from myelitis and radiculopathy from those that are caused or contributed to by Bustetter's Other Limited Conditions, including knee arthritis, shoulder tendonitis, or degenerative conditions in his spine." (Doc. # 49 at 31).  Standard also draws attention to internal inconsistencies in the FCE, such as Ms. Scholl's statement that Bustetter is limited to sitting for no longer than one hour but is able to drive for two hours. (Doc. # 49 at 30–31).

(Doc. # 52 at 12-13).

In its present Motion, Standard provides still more reasons to discount the results of the FCE.  First, there is evidence that Bustetter's pain symptoms improved since the FCE was conducted in January 2017.  In March 2017, Bustetter's neurologist, Dr. Dalton, wrote that the muscle relaxant Robaxin "seems to be helping quite a bit without any significant side effects.  If muscle spasm pain was a 10 before, now a 7/10 sometimes

19

down to 5/10." (AR 90). This success continued into April, when Dr. Dalton reported that Bustetter "notes improved control of his pain/muscle spasms on Robaxin." (AR 96). Second, certain conclusions in the FCE are contradicted by other evidence in the record. For example, Standard asserts—without response from Bustetter—that "while [Scholl] reported the claimant had 'impaired fine motor skills' during the FCE, neither his neurologist nor neurosurgeon documented any abnormality with his fine motor skills." (Doc. # 71-1 at 19).

Given the many shortcomings in the FCE, it cannot serve as a basis to conclude that Bustetter is disabled under the terms of the plan, particularly in light of the Court's obligation to "[weigh] each expert's opinion in accordance with supporting medical tests and underlying objective findings." *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBA Emps.*, 741 F.3d 686, 700 (6th Cir. 2014); *see also McAlister v. Liberty Life Assur. Co. of Boston*, 647 F. App'x 539, 549 (6th Cir. 2016) (declining to give weight to an ERISA plaintiff's expert report that was "not reliable").

Bustetter points to treatment notes from Dr. Dalton, which he says confirm the results from the FCE. Dr. Dalton wrote that

> [p]rior to developing transverse myelitis [Bustetter] was found to be partially disabled per his functional capacity evaluation and since that time has had another functional capacity evaluation which determined that he was unable to work. We discussed that even If there is no change in his MRIs it is likely that the previous intramedullary lesion has left permanent damage and therefore his noted functional capacity will likely be impaired long term.

(AR 89). Unfortunately for Bustetter, Dr. Dalton's summary reference to the findings of the FCE is not enough to validate them. Furthermore, while Dr. Dalton confirms Bustetter's diagnosis of myelitis, his sensory loss and weakness, and the permanent nature of his impairments, her treatment notes do not answer the critical question of

20

whether Bustetter is unable to perform sedentary work with accommodations, which in turn goes to the ultimate issue of whether Bustetter is disabled under the "Any Occupation" standard in the plan.  In short, "medical data, without reasoning, cannot produce a logical judgment about a claimant's work ability."  *Elliott*, 473 F.3d at 618.

By comparison, in cases where plaintiffs have succeeded in demonstrating disability, there was evidence clearly identifying the claimants' functional deficits and linking those deficits to specific job duties.  For instance, the Sixth Circuit in *Javery* held that the claimant had demonstrated disability from his own occupation as a software engineer when his attending physicians concluded that his mental illness, pain medication, and persistent back pain made him "'incapable of minimal (sedentary) activity'" and "'totally disabled' from his regular work at Lucent, with or without restrictions."  741 F.3d at 691, 701 (quoting physician report).  One physician in particular "indicated that Plaintiff could not tolerate sitting, standing, or walking, even with positional changes and meal breaks, for more than 2.5 hours."  *Id.* at 691.  Similarly, in *Bruton v. American United Life Insurance Corp.*, the claimant's doctor documented the fact that the claimant's opioid medication had the effect of negatively impacting "'his memory and processing, [and] therefore, his ability to be productive at work,'" and further concluded that "'returning to work even in a sedentary capacity' was not feasible."   798 F. App'x 894, 905 (6th Cir. 2020) (quoting physician report).

The absence of sufficient and reliable medical evidence in the record showing disability is problematic for Bustetter because the Group LTD and Life Policies place the burden on the participant to prove eligibility for benefits.  *See* (AR 42) (requiring participants provide "written proof that [they] are Disabled and entitled to LTD Benefits");

(AR 805) (stating that to receive benefits under the Group Life Policy, a participant must submit "satisfactory Proof Of Loss").  The Sixth Circuit has repeatedly held that, when required by the plan, the employee must prove his entitlement to benefits.  *See, e.g.*, *Javery*, 741 F.3d at 700; *Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 661 (6th Cir. 2013).

The Court in its previous order remanding for a full and fair review held that although Standard had acted arbitrarily and capriciously, Bustetter had not demonstrated that he was clearly entitled to benefits.  (Doc. # 52 at 16).  Bustetter was therefore on notice that the evidence in the record at that time was likely not sufficient to prove his claim.  Yet, Bustetter rebuffed Standard's repeated invitations to supplement the record on remand.  Bustetter's decision to stand pat was costly.  As the Seventh Circuit has explained, "[t]he plaintiff is the one who is obligated to prove she is entitled to benefits, so any gaps in the record cut against her claim."  *Dorris v. Unum Life Ins. Co. of Am.*, 949 F.3d 297, 304 (7th Cir. 2020).

Bustetter correctly notes that, subsequent to the Court's remand order, the Social Security Administration (SSA) awarded him disability benefits.  (Doc. # 70 at 23).  But "administrators are not bound by the Social Security Administration's determination."  *Cox v. Std. Ins. Co.*, 585 F.3d 295, 303 (6th Cir. 2009).  This is especially so in a case such as this one, where the claimant has not submitted the record underlying the SSA's favorable decision.  *See id.*; *Marcin v. Reliance Std. Life Ins. Co.*, 138 F. Supp.3d 14, 24 (D.D.C. 2015).  There are "critical differences between the Social Security disability program and ERISA benefit plans," *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003), notably regarding the weight required to be given to the opinions of treating physicians as well as the allocation of the burden of proof, *Tracy v. Pharmacia & Upjohn*

22

*Absence Payment Plan*, 195 F. App'x 511, 518 (6th Cir. 2006).  So while it is true that the SSA's award of benefits is generally not "meaningless," *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 294 (6th Cir. 2005), its significance in this case is uncertain without knowing the evidence the agency considered or the reasoning behind its decision.  Bustetter's receipt of Social Security benefits thus does little to move the needle in his favor.

Finally, the flaws Bustetter says plagued Standard's decision on remand, including exclusive reliance on record reviews, use of a faulty Transferrable Skills Analysis, inadequate discussion of the FCE, and cursory treatment of Bustetter's LWOP claim, (Doc. # 70 at 24-27), are all beside the point because "it is irrelevant on *de novo* review whether a plan administrator's decision was principled or reasoned." *Javery*, 741 F.3d at 699.  Rather, "[t]o succeed in his claim for disability benefits under ERISA, Plaintiff must prove by a preponderance of the evidence that he was 'disabled,' as that term is defined in the Plan." *Id.* at 700.  As discussed above, Bustetter has not done so.

## III.   CONCLUSION

Accordingly, for the reasons set forth herein,

**IT IS ORDERED** as follows:

(1)   Defendant Standard Insurance Co.'s Motion for Judgment on the Administrative Record (Doc. # 71) is **GRANTED**;

(2)   Plaintiff Lewis Bustetter's Motion for Summary Judgment (Doc. # 70) is **DENIED**; and

(3)   This matter is hereby **DISMISSED WITH PREJUDICE** and **STRICKEN** from the Court's active docket.

A Judgment in favor of Standard will be entered contemporaneously herewith.

This 29th day of March, 2021.



Signed By:

**_David L. Bunning_**

**United States District Judge**

J:\DATA\ORDERS\Ashland Civil\2018\18-1 MOO Granting MSJ for Standard.docx